Good morning, your honors. Ezequiel Cortez for Mr. Kiefer. I'd like to reserve two minutes for rebuttal, if I may. As I read over the briefs again yesterday, I asked myself, what can I contribute at oral argument? And I thought about this. I took excerpts, and all of this is in our excerpts. I took excerpts from the excerpts, if you will, and here's what I came up with. This very court in United States v. Henderson, only three years ago, said the following about the sentencing guidelines in child pornography cases. And I quote, the child pornography guidelines were not developed in a manner exemplifying the commission's, the sentencing commission's, the commission's exercise of its characteristic institutional role. Judge Miller, in this very case, now a senior judge with vast amounts of experience. Judge Miller, Judge Miller, from where? Jeffrey Miller, San Diego. He was in superior court for a very long time. And then he transferred to federal court. We didn't. Oh, sorry. Judge Miller. Yes, Judge Miller, the district court judge in this very case, said the following. I also concur with a vast number of judges, vast number of judges, that the guidelines for receipt and possession of child pornography are in many cases excessive and unreasonable and more than necessary to buttress. That's true. And there's been a lot more said since then. Correct. And there have been studies to that effect. Correct. And if anything, the judicial view is even stronger now. Correct. But in this case, the defendant was sentenced way below the guidelines. Yes, he was. And Judge Miller. You're saying that the guidelines are too harsh. Yes. Doesn't really get you too far since they didn't use the guidelines. I shouldn't say didn't use them, but they didn't hold him to the guidelines. They said they recognized they were too harsh. Yes. Gave him much less. Candidly, I have to admit, yes. Judge Miller, after applying all the guidelines, and I'll get to one in particular, he gave a sixth-level downward departure. So he came down to 63 months from a 50% downward departure. Exactly. From the 121 to 151 months. That's a pretty substantial departure. Absolutely, Your Honor. So where was the error in the calculation? Before we get to the discussion of the guidelines, let me ask you this. If we disagree with your argument that the guidelines were incorrectly calculated, does he have standing to challenge the five-year mandatory minimum? Excellent question. Judge Miller answered it. And allow me to tell you why. He said no. I'm sorry? He said no. Allow me to tell you why. If you allow Judge Miller's own application of the guidelines, and they know we'll review because that's what you have to apply, Judge Miller himself said the following about the plus two for use of a computer. No, no, no. My question is a little bit different. If we're going to give you an opportunity to talk about the guidelines and his calculation of the guidelines, I'd want to hear your views on that. But getting past that for just a moment, if we decide that the district court correctly calculated the guidelines, would your client have standing to challenge the five-year statutory mandatory minimum? Thank you. And I was going to answer that question. Let me tell you how. Did you go to charm school? I'm sorry. I'm sorry. Sometimes I'm very involved in my own argument. That's all right. Allow me to tell the court why I'm talking about the mandatory minimum. He gave your client a pretty good deal. Yes, sir. To a certain extent. Do we? You know, this is pretty, I've read all this stuff, gone through it. Like you said, you were thinking about it last night. I've been thinking about this the night before, you know. Thank you. For many more. We spend a lot of time on these cases. Thank you. And, I mean, what went on here with your client was pretty bad. And I thought he was very lenient with them. I understand. And allow me to answer your question. I'm sorry. You got the volume. Yes. Of what he had here. Yes. He got his own children.  You know, all this stuff. Yes. I mean, I mean, I think he was very kind. I understand. Next time I meet him at a conference, I'll tell him that. Thank you. You know, the federal judiciary has gotten so big that we all used to know each other, but now there's so many of us. I understand. Yes. I used to be a delegate to the Ninth Circuit myself, and it was a pleasure to see a lot of your judges, justices. Let me answer your question. Not justices. Justices. No. I call you justice. No. Your appellate justice in my mind. No, no, no, no. Okay, judge. No, no. Let me answer your question if I may. A great judge who would have enjoyed talking to you, but he's no longer with us, and his name was Walter Ely. Yes. And when something like this had come up, he'd say, we're judges. There's no justice on the Ninth Circuit. Wow. You don't know that, huh? You've been around. I like that. Yeah, I like it. Let me answer your question. I'm sorry for being rough. Don't ask any questions. We've got enough problems. I understand. I've got enough problems. The reason why we have standing. You know what an ego war is? Yes, respect for, may I say it in Spanish? Sure. El respeto al derecho ajeno es la paz. Now, how do you translate that in English? I don't know. Yeah, well. That doesn't help much. Respect of this property will give you peace, roughly. No, he didn't say that. Well, he did. No, he didn't. Benito Juarez, Oaxaca. He may have said that, something else. Now, listen to this. Okay. I grew up in East LA. I know what you're saying. Compton, too. Yeah. He said, for my friends, justice. All others, the law. I understand. I like that. I like that. May I answer her question? Standing, yes or no, before you run out of time. Yes, we do. Because if you apply the minus 2 for computer, the plus 2, if you take the plus 2 for use of the computer away, which the judge said it was double counting. If you take that away, you're below the mandatory minimum of five years. You're at the four-year level. Judge Miller also said that if it was up to him, the very judge that was very kind to Mr. Kiefer, if it was up to him to enact mandatory minimums in a case just like this, he'd say there'd certainly be less than five years, because even that was too harsh for the facts in Mr. Kiefer's case, with all the aggravating factors. Do we have standing? Judge Miller said that he believed the plus 2 for computer was double counting. It's in our excerpt. He specifically held it to be double counting. I didn't see any case law in our circuit on it, but you're asking us to go against multiple other circuits that have spoken on this issue. The Second Circuit, the Fifth, the Sixth, the Seventh Circuits have all said it's not double counting. I understand that Judge Miller felt it was. Our argument would be that it is. And I understand I'm going against the grain, but the U.S. Supreme Court did so in the Amy Vickie v. U.S. in the Parolin case that was just decided. What does that have to do with this situation? Because in that case, the statute required a mandatory restitution amount, mandatory. U.S. Supreme Court found that that should not be imposed to all levels in this type of sentencing scheme. In other words, for receiving and possessing child pornography, you should not be treating those individuals the same as you treat everyone else. And where it said shall in the restitution statute, that should not apply to people receiving or possessing only. So the whole thing was struck down. Now, what does that have to do with this? Here, Judge Miller, if you look at the colloquy, if you look at his observations, he found in the specific facts of this case, five-year mandatory minimum would be too much. He said that. If it was up to him, he'd enact a lower mandatory minimum, which incidentally the Sentencing Commission also just found in 2012. So we believe we do have standing because if Judge Miller followed his own logic about the computer use, then we would be below the mandatory minimum five. Well, the life of the law is not logic, but experience. But experience. I like your quote. All right. Thank you. Right on time. Good morning, Your Honors. I'm Ann Perry, representing the United States in this matter. I didn't go to CHARM school, and I am not nearly as entertaining as Mr. Cortez. You didn't go where? To CHARM school, and I am not. Oh, you are charming. I appreciate that, Judge Pregerson. It's been a long time since I've seen. What? I wanted to say that I. A long time since when? I've seen you. I actually saw you when you first judged the case of the NFL case when the L.A. Rams were, or I'm sorry, when the Raiders were coming down. A big difference. Oh, I know. I was a Raiders fan back then. What can I tell you? It was the guy that ran the Coliseum Commission. That was an amazing case. I had a friend who was extering for you at the time, and so that's been a long time. What was his name? Frank Fine. He was from Loyola Law School. This is 30 years ago. Oh, okay. Where did you go to law school? Loyola as well. And were you there in the, I could have gotten you floor seats, or what do they say in basketball? You could have sat right next to V. Estiviano. There you go. And we could have had meaningful dialogue, just like I've seen her on TV. What did you say? V. Estiviano. Oh. Sterling's girlfriend. She wasn't there. But we had a Sterling bailiff. His name was Ted DeFed. I remember Ted DeFed. You remember? He tried to revive one of the owners. Jane Clark. Jane Clark, right. Who used to sell Volkswagens? He owned the churches. Yeah, I just wanted to go ahead. He was a good guy. Your Honors, about 10 years ago, I believe, I appeared before Judge Reinhart and another panel, I believe Judge Trott and Judge Tashima, on a child pornography case. It has some bearing on the issues relating to Mr. Kiefer. That case was United States v. McCoy, and it dealt with an individual, actually a mother and father, that had taken Polaroid snapshots of a revealing nature of their own children. And at that time, this panel, the panel, not this panel, the panel held, that that kind of homegrown pornography was, as applied, not a violation of the federal pornography statute. We've come a long way in the last 10 years, which brings us to Mr. Kiefer, who's at the opposite end of that spectrum. The challenges that were raised in the appeal before this Court. I'm saying that panel held that parents could take. No. No. That's what I thought you said. No, she said it's not a violation of the statute, for parents to take pictures of their own children for their own purposes. It wasn't, and it was part of the record, that these particular pictures had never been distributed. When I was growing up, the thing they would do, they had photographers come down the streets, and they would take a picture. And you've seen them. They had one of me on a kind of a bare rug, whatever it was. Can we still get those? Totally naked. I was probably about six months old, and my parents liked it so much, and they came in an oval-shaped frame, right in the living room. And she came to the house, and my sister would torment me, used to bring her girlfriends and say, look at Harry. I still have the picture, and I think I'll put it in my chamber. Well, anyway, we no longer try to prosecute people for having pictures of their own children. This is true. Well, it just shows how far we've come, Your Honor. And the reason why I say that is because the challenges that were raised in the appeal were twofold. Number one, that the statute was unconstitutional as applied to Mr. Keefer, the five-year minimum mandatory punishment, as well as the applicable guidelines. And I think it's abundantly apparent from the facts and circumstances of this case, as well as the prevailing law, if not here in the Ninth Circuit, but throughout the United States, that these arguments just must fail. First of all, as a factual matter, Mr. Keefer was eminently appropriate to be punished under these statutes. He was a member of an international bulletin board. He was exchanging images. He had over 4,000 images four years after his participation in the bulletin board. And as a result, the application of a more stringent statute to him would not be unconstitutional. Similarly, the guidelines that applied to Mr. Keefer in this set of circumstances were not unconstitutional. And I'd like to address specifically the one that keeps coming up, whether Judge Miller found that the two-level increase for the use of a computer was inappropriate. His actual comment was that Mr. Keefer's argument resonated. And a review of the record will show that the court did allow for that two-level increase and then later departed six levels to give Mr. Keefer a sentence that he felt was more appropriate. I've had many of these cases with Judge Miller. In fact, Mr. Cortez and I have had many, a couple of other cases like this with Judge Miller, and he has a specific view of the punishment that should be meted out for unconstitutional conduct. Mr. Keefer, however, that however does not translate into an unconstitutional as applied argument with regard to Mr. Keefer. There's nothing in these statutes that are inappropriate, that his particular conduct would make it so wrong for him to be prosecuted, or that the guidelines would be fashioned for him. And the court's right. He got a heck of a break. It was about a 50 percent departure. Based upon Mr. Keefer's activities, based on the longevity that he was collecting the material and receiving it from the Internet, we did argue for a much stronger sentence. And we didn't get it. If you have any further questions? Is he going through any treatment program if there is such a program? They have all kinds of counseling and treatment programs for these individuals. And he did receive, I believe, seven years of supervised release, and I can guarantee that will be part of it. It always is. He was undergoing treatment, I believe, with some of our recognized therapists down in San Diego before his sentencing. And I know that also resonated with the judge. Well, okay. Thank you, Your Honor. Very briefly, I know. Wait a minute. It's good to have an admirer here. You know, come on. You don't want to push your luck too far, do you? No, I don't. I'm from East L.A., I told you. I understand. So don't. You're fine. Then I won't push my luck. I thought you were a movie star. No. Mustache and white hair, white up here. Who's your makeup artist? They told me they had live streaming here, so I went and did this. Good. They think I'm the guy with that Stay Thirsty, My Friends, the Dos Equis commercial. Oh, yeah. Well, I'm Harrison Ford. Thank you. I don't have any more comments. No. Okay. Good to see you. Thank you. Yeah. Thank you, Your Honor. Good to see you, too. Good to see you. Oh, of course. Yeah.
judges: Pregerson, Reinhardt, Nguyen